423-0486. I'd ask counsel, starting with counsel for the appellant, to state your name and Good morning, Justice. Michael DeBate on behalf of Mr. Reinking and Matthew Goldman on behalf of the people of Iowa. In this case, prior to the hearing or the trial that took place, his attorney, Kevin Sullivan, entered into stipulations with the state. The written stipulations were only signed by both the state and Mr. Sullivan. They were not signed by Mr. Reinking. The back history on that is that Mr. Reinking had objected to any stipulations that were going to be presented to the state in this case. He was not going to stipulate to those. In January, on January 6th of 2022, Mr. Sullivan emailed a list of stipulations to Mr. Reinking. On January 11th, Mr. Reinking wrote back he would not agree to those stipulations. So he did object. Mr. Sullivan knew that. He didn't object, did he, counsel, to any stipulations? He just objected to those. He objected to those stipulations that were already written out. He's not an attorney, so he didn't know any other stipulations. This is what Mr. Sullivan wanted to present as part of the case. And he was not agreeing to that wording in those. He had a friend, Mr. Munsing, who was a professor at Bradley, was kind of helping him along here, meeting with him. And he had sent Mr. Sullivan a suggestion on January 13th for what might be acceptable for stipulations. Attorney Sullivan later testified that there were no other written stipulations that were presented between the parties. He said that he had discussed stipulations with Mr. Reinking. They had met maybe three times after January and before the trial in May, meeting the last time, May 12th, which would have been the day before the trial, with Mr. Reinking and his wife. Mr. Sullivan said at that point he remembered discussing them, but he didn't remember if he ever showed them to Mr. Reinking, but he discussed them. Every time I pressed him on the issue of did you actually show him these, how did he know what these stipulations were? He couldn't provide any documentation. He couldn't remember any dates that he'd actually presented something to him. And his testimony was that he doesn't remember actually providing anything in writing to him, just that they discussed them. So on May 12th, on May 13th, when the trial takes place, that's the first time that Mr. Reinking is aware of these stipulations. They're presented to the court. The court asked Mr. Sullivan, have you gone over these with your client? His response was as recently as yesterday. Mr. Reinking also has hearing difficulties from birth. He wears a hearing aid. He has difficult hearing, especially if somebody is not facing him. So part of the thing that came out in the hearing about this was that Mr. Reinking didn't object at trial when they were talking about these stipulations that were going on. First, Mr. Reinking didn't know anything about stipulations. He's not an attorney. He doesn't know this. He was relying on Mr. Sullivan to explain to him what was going on at work in his best interest. That didn't take place. So the court relied upon the fact that Mr. Reinking didn't stand up at trial and say, I object. Or did the court rely upon the fact that he didn't interact with his attorney on that subject? I mean, every word that was spoken to him by the judge who asked him numerous questions, face-to-face, amplified probably, and all the examination and cross-examination, he had no trouble hearing any of that. Well, at the trial, the judge didn't really interact that much. He just said, did you go over this with Mr. Reinking? And Mr. Sullivan said yes, as recently as yesterday. At that point, the state's attorney, Mr. Hawley, got up and started to speak, facing away from Mr. Reinking, and he went over what he was going to present in his opening statement about some of the stipulations, but that wasn't addressed specifically by the judge with Mr. Reinking. It was more ASA Hawley that was talking to the court, just as we're doing today, with Mr. Reinking sitting there not facing him, unable to really hear what's going on, and assuming that Mr. Sullivan is working in his best interest. And these stipulations— Counsel, if I may, though, there was a point during his testimony where Attorney Sullivan directly asked him in one of our stipulations, number five to be exact, it said that you had a Bushmaster AR-15 firearm in your possession, is that correct? And the defendant responded, that's what they say, I don't know what the firearms were at that time. So at that point during that questioning, he was well aware of the usage of the word stipulation. He clearly heard that. So at that moment, even if we disregard or even we accept that he didn't hear the other stipulations, shouldn't he have objected to his attorney's reference to that at that time? He was agreeing to the fact that the firearm was returned. And if you look at that part of the transcript, Mr. Sullivan even had to correct his language because at first he said gave and he said, did you return the firearm? Because that was a part of the stipulation that was under scrutiny. Mr. Reinking was willing to agree to a stipulation that he had returned the firearms to Travis, but he was not willing to say the word give or gave because that was part of the statute that was being challenged initially when another attorney was representing him. They filed a motion to dismiss based upon that. And Mr. Sullivan had even said at the start of the trial when he renewed that motion that they were not stipulating or they were challenging the word give or gave because of ambiguity. So that's what Mr. Reinking was saying. He never objected to the fact or said that he didn't return the rifle to Travis. Let me be clear then. Does Mr. Reinking or did he object to the usage of stipulations? Yes. But you also just said that he didn't object to the use of stipulation as long as it had return instead of give. That was what he had, if you look at what they had sent back to him or what Mr. Muncy had talked about discussing with Mr. Sullivan about what would be acceptable. I'm discussing at the point of trial. So we're beyond January. Under direct exam? Yes. Okay. Under direct exam, you know, I don't even know if he knows what the word stipulation is, you know, specifically when he's, you know, under direct exam. But he knows that, yes, he did return the rifle to Travis based upon what deputies had told him to do. And that's part of this problem is that there weren't defenses put in here. Mr. Sullivan didn't investigate. Before he did these stipulations, the other stipulations he put in there, he agreed to things that never should have been agreed to because the state had no evidence for those. But Mr. Sullivan agreed to them. Well, let's talk about that. One of the things that you benefit from in a stipulation is not having to do kind of the leg work to get facts that are fairly uncontroversial. So, yeah, there wouldn't be facts in the record if things were stipulated to, right? That's their purpose. That is correct. So, I mean, some of the things like Mr. Runking's son receiving mental health treatment at that facility, that's the kind of thing that could have been easily documented. I'm glad you brought that up, Your Honor, because, no, it could have been had it existed. But it didn't exist. That's the problem we have here. Did it not exist or are you saying it's a question mark? We don't know. I've got the records from the hospital. There is no record of treatment by definition. If you look at the statute, the statute very clearly defines both mental health or the facility is defined. So is patient. If you look at how they define patient, it goes into having treatment. There is no record of treatment at Unity Point. He was there. He was there, but there's no record he received treatment, and that's the tricky part of this because if they can't prove that in the statute, they can't convict him. And in this case, there's a multitude of errors that took place that Mr. Sullivan should have investigated, starting with the fact that Travis went there. He was involuntarily committed. So he was involuntarily committed. After he went. That would have been under the mental health code. Correct. And it would have been the judgment of the clinicians what treatment he would receive. If he received treatment. Well, are the records you acquired from the hospital or from the treatment facility or from the mental health facility, are they in the record? There's no treatment in the record that I could find. Are what you discovered from the facility, is that in the record? Our record. Oh, your records. No, that was never presented in the records. I did not do the trial, so that was not presented in there. I couldn't present it afterwards. But what happened, Your Honor, in this case. Wait a minute. We don't know. You're asserting something that's not part of the trial record to make a point on appeal. How does that work? Well, the question was asked if there was something there. I'm simply saying from my investigation, there was nothing there. What was there, though, is an involuntary commitment. That triggers certain events. An involuntary commitment, the circuit clerk is required by statute. They must, they shall report that to the state police. That never happened because that triggers. You're going on to another point. I understand that, the responsibility. I'm trying to grasp why you think that your examination of those records, or whatever you did, demonstrates that no clinician provided him any medication, talked to him, visited with him, checked on him in his room. Eventually, he's released. If protocol is followed, he's released when he's no longer a danger to himself or others. Or if he's not cooperating. They can just not cooperate and be released. There's many things that happen in these institutions that somebody can go there and just not take treatment. They cannot receive treatment, and then they'll get released. So, in this case, that's the part in a stipulation that an investigation should have been done. You don't just stipulate to something. If you're looking at the records, you want to see something. You want to see something that was there that says, okay, he received X amount of treatment. He received this. Did he receive a pill? I don't know. So, that's where Mr. Sullivan failed in his ability as an attorney. That's his responsibility. You don't stipulate to something unless there's hard facts there that they can bring in and instantly just show, such as if you're going to do a drug case. And they've got the drug report there. They say it's .5 grams of methamphetamine. Do you really want to bring in the lab technician to say this is what I did when you can just stipulate to that? Yeah, you would stipulate to that. You don't stipulate to something where there's no evidence. And that's my point here is that there's a litany of things that should have taken place. Had he received treatment in that facility, there's a duty to report that within 24 hours to the state police. If they found him to be a threat to himself and he's receiving treatment, they must report that to the state police. That would not affect a party's liability under the statute under which your client was charged. Are you talking about the Floyd statute? No, I'm talking about the statute under which he was charged. It doesn't matter whether a clerk did or didn't give notice to the state police. Well, it does matter in this instance as far as the attorney doing his work because if nobody was notified, if all of these people who shall report to the state police to revoke somebody's Floyd card don't report, first off, the clerk, the doctors, the police officers, none of those people report to the state police to revoke Travis's Floyd card for mental health reasons. How is Mr. Reinking supposed to know he received any treatment? All of these people fail, and the only thing he was revoked for was for being a nonresident, which is a misnomer because if you're a nonresident, you're not required to have a Floyd card. So the second they revoke you for being a nonresident, you're exempt from Floyd. But that's the only thing that Mr. Reinking knew that Travis's guns were taken away for because of the Traswell County Sheriff's Department. Right, but that's a factual question about what he knew. And like many of the issues in the case, your position has the problem of having factual findings going the other direction, correct? The trial judge made findings. Well, he made findings based upon stipulations that weren't appropriate because Mr. Reinking had objected to those stipulations. What was the one issue that he didn't stipulate to? The one issue he didn't stipulate to? They were willing to stipulate to the return of a firearm. Right, and that's another interesting issue because there was never an argument by your client that returning the firearm was not covered by the statute. There was never a statutory construction argument that returning isn't the same as giving. Well, the argument was made in the motion to dismiss. But it wasn't a question of statutory construction. It was a question of over breadth, which seems to assume that the statute may have covered it. It was never an argument made that returning isn't giving. So I'm not sure that the stipulation really foreclosed that. Are you saying because Mr. Sullivan stipulated to in that number five stipulation that he gave it back? No, what I'm saying is he never built an argument that said returning does not equal giving. He never made that argument. So the import of the stipulation seems to fade when that argument isn't made. I think that he did so in the sense that they actually changed the language in the question because Mr. Sullivan then said, did you return it instead of gave. And that is the ambiguity that was brought up in that motion was that there's many meanings to the word give. But what legal issue in the case does it relate to? If it had been give, I'm sorry, return instead of give, what legal issue in the case would have been affected by that? Just the statutory language that he actually give him back. He returned something that wasn't his. He returned those to the rightful owner. He didn't give him anything because he had no possessory interest in those. But that argument was never made. By Mr. Sullivan, which was his problem, and that was ineffective on his part because he stipulated he even said that. Does your appellate brief say he was ineffective for not making the statutory construction argument? I didn't put it that way because the fact that he stipulated to it after he said and even said he did it improvidently, that ineffectiveness would have been because he didn't make that argument at trial. He should have made that argument at trial. But he didn't. He just relied upon the fact that that motion had already been filed. He adopted it. And then he stipulates to something he's trying to argue, which is total incompetence on his part. If you're an attorney, you stipulate to something. Then you go in and argue it. But it was never argued. All that was argued was that the statute was unconstitutionally vague because it was unclear whether it included return as well as giving. I would say that the non-argument of it is a display of incompetence on Attorney Sullivan's part because Mr. Reinking can't make that argument. He can't present these arguments at trial. That's not his job. That's Mr. Sullivan's job. And is it a strategic decision which arguments you make? I don't know what strategy would have helped there. You're arguing the fact that the statute is ambiguous, and then you stipulate to it. And then at trial, you put the question out there, and then you change the language to make sure it says return. So that falls strictly back to Mr. Sullivan. It doesn't have anything to do with Mr. Reinking because he's just going by what his attorney is telling him to do and direct examining him. He's trying to answer questions that are being asked. The first question on the stipulation is did your client object? And there's a factual finding that says he did not. The court made that, yes. Right. That's where they come from. Yes. So we would have to find that finding to be against the manifest way to the evidence. Correct. And that's why I bring in these other parts about the statutory requirements that took place, that there's no reason that a competent attorney would have stipulated to these things. That's the second issue about whether that's competent strategy. But the first question about whether your client objected, the factual finding by the trial court is going against you. Well, he's saying he didn't object at trial. Like, he's supposed to stand up and jump up and down and say, I object. Counsel, that's overstating. He doesn't have to stand up in the middle of his own bench trial and say, I didn't agree to these stipulations. You whack your attorney with your elbow. You discuss with him. His friend from Bradley passes a note up. His wife, who contests all of these things, says something to the attorney. That happens all the time without disrupting the court proceedings. And none of that occurred. And back to Justice Doherty's quote, you know, you're kind of going uphill when you say the trial court said, I believe these witnesses, these witnesses do not have credibility. I find the attorney was competent or find he was not ineffective, yet you say he is. Tell me about that journey. Well, in a situation like that, and, again, the part about him objecting, even Mr. Hawley in his commentary back when we were in there was saying, you know, that he didn't stand up. He didn't say anything. He didn't object. But the fact that the court found Mr. Sullivan credible, that's his judgment. Credible and competent. And competent. You know, that's many times Mr. Sullivan, in my question of him, he could not answer questions specific to what did you do here? Did you have any documentation? It was always, well, I don't remember that, but I'm sure I did this. Even though I had witnesses that were there and said he didn't do this. They just fell back, I guess, because perhaps the court just decided because Mr. Sullivan is an attorney, he'll believe him instead. But even though he couldn't present facts and specifics as to why he did these things or when he did them, just that he did them. When you ask specifics, you don't get an answer. It's like, well, I don't know, there was, was anything ever, I'll ask him, did you ever produce anything and show it to him? Well, I don't know if I ever showed it to him, but I know we discussed it. And I don't know when, but I'm sure one of these meetings we discussed it. Right. But you haven't shown us your argument today. We've discussed it and we're still getting the gist. I don't know that discussing it as opposed to writing it is absolutely essential to say he understood and he agreed. But what's irrefutable is the fact that on January 11th, Mr. Reinking sent him, Mr. Sullivan, a note, I don't agree to these. Right. And we know that there was some other edits. We don't know what exactly they were. Well, Mr. Sullivan doesn't know either, because when I asked him, he didn't know either. The only thing we know is that something was produced on that date and given to the court on that date. And so he can say whatever he wants. He's the one that produced it. And if he knows, as an attorney, if you know your client's objecting to something and you haven't presented it to him in writing, you give him this in writing. Yeah, but let's not flatten the timeline here. There was a series of events, and he shared these things in writing. He said, I object, and they had subsequent conversations. I mean, one inference from that, maybe one the trial court drew, is that the client accepted the attorney's strategy on these things, to not make an issue of that and to focus on the issue of what he heard at the occurrence, which seemed like a reasonable choice. But the court heard nothing from Mr. Reinking about any of that. I believe your time has expired. Thank you, Judge. Mr. Goldman? Matthew Goldman for the people. May it please the court, counsel. I'll address the sole point that was brought up on opposing counsels. Before you do that, I want to ask you a question. Had a tragedy not occurred, would this case have ever been brought? That, unfortunately, I don't know, without getting into the mind of the prosecutor who brought the charges. I certainly think that it's possible. I once worked as a public defender, and I had to defend against a client who was accused of transferring a firearm illegally to her son, and there was no tragedy that came out of that case. It was a Class IV felony. Luckily, my client ended up getting probation. But this is not the first time I've seen a case like this, and this is not the first time that I've seen a case like this brought about due to certainly much less tragic circumstances than we see here. Thank you. Yes, Your Honor. Regarding these stipulations, as Your Honors know, the two criteria that have to be satisfied for an attorney to enter into stipulations like we see in this case, it's first that no objection be made, and as Your Honors noted, there was no objection, certainly, in court. I understand that opposing counsel brings up this written email that was sent months previous to the trial date, but I think that this kind of written communication fails to count as an objection for the purposes of this case for several reasons. First, the timeline of when this was sent, it makes it so that this is not any kind of objection that it would be regularly recognized by a court. This is months. If that's all we had? I'm sorry? If that was the only communication between attorney and client, you're saying that wouldn't be an objection? Well, in the content itself, I would also argue that that cuts against it being an objection because it was a conditional objection. It was, I'm objecting so we can talk more, and certainly we heard testimony, or we saw testimony in this case, that they did talk more, several times more, prior to the trial itself. So insofar as an objection was made, the condition on which it was made was actually satisfied prior to the trial. Additionally, the timeline, an out-of-court objection made months and months prior to the trial itself, this is not like the defendant standing up in the courtroom or telling his attorney the day of. Right, but there is no case law that you've provided that suggests it has to happen in the courtroom by standing up and objecting. If the attorney has been told by the client, I don't want to do that, that's an objection. Well, the Supreme Court, while it didn't hold directly that an in-court objection is required, it did state that no objection was made in court when it was making its decision. I apologize, I'm forgetting the case off the top of my head, but I cite it in my brief. And again, while I don't think that it's a hard and fast requirement that the objection be made in court or the day of court, I think the timeline in which this so-called objection was made is something this court can consider in coming to its determination, along with the language of that purported objection as well, and the fact that it was a conditional objection. Is it a factual finding, meaning the question of whether somebody objected, how they objected, that's a factual finding? Correct, and you have that exactly right, Your Honor. This was a factual finding made by the court where they looked at all of the evidence that was presented, the testimony of all the witnesses, and the court determined, based upon everything that it had before it, that there was no objection made that it would essentially count for the purposes of this requirement. Additionally, whether or not this stipulation was a matter of trial strategy, I would argue that it clearly was. Courts have regularly recognized that narrowing the issues before the court is a legitimate trial strategy, especially in a case like this where it's narrowing the issues to one that is a little bit more complicated, mens rea, the mental state. What about the interaction between the word gave and the constitutional argument about vagueness? It seems as though those are at cross purposes, so what would be the strategy in not saying returned? Well, the stipulations were essentially factual stipulations for trial, and that was a legal argument that wasn't really being argued at trial. Nobody would at that trial decide, well, because of this constitutional issue that was raised beforehand, we're going to suddenly find him not guilty because of a factual problem at trial. But would it close the door? I'm sorry. Well, I guess the question that I have is it's really difficult to reconcile how counsel's argument that he wanted to challenge on appeal, the use of the word gives, and that was the entire basis of the pretrial motion, but then turns around and stipulates to that very fact in stipulation number five. And, Your Honors, what I would say about that issue is that even if that were a problem, there was no possible prejudice from this because everybody, including the court, agreed that that issue is preserved, and certainly opposing counsel was able to raise that issue without problem in this court. So the goal, which was preservation of that issue, was achieved despite any lackluster wording in that particular stipulation. So even if there was a possible error there, there was no possible prejudice due to the way that the court interpreted the stipulation. But there was no argument made at trial that as a matter of statutory construction, returning is different than giving. Correct. Right? And had he wanted to, he couldn't have because he just stipulated that he gave it. Yeah. And I don't think that this was a factual argument that would have or could have been made at trial. I think it's rather obvious, as Your Honors recognize, that returning in a firearm does fall under the umbrella of give. Does it? Because I think one of the rules of statutory construction is you look at like words in a sentence to help each define the other, and selling has a certain connotation. It's going from one person to the other. Giving has a certain connotation, going from one person to the other as a matter of gift. This is a case where the defendant stepped up and took those firearms, and it has the error of maybe no good deed going unpunished. Sure. It seems as though that would be a plausible argument to make, wouldn't it be? Again, Your Honor, even if there was some possibility of making that argument, defense counsels are allowed to narrow the issues and pursue one defense even with exclusion of others. So even if this is an arguably meritorious argument, which I may disagree with, counsel is not obligated to make this argument. And what you're describing is a factual argument that potentially could have been made in the trial court, but the fact that it wasn't made didn't damage the ability to raise the constitutional argument. The defendant was not a law enforcement official. He didn't have a right to take the weapons. He was given the weapons by his son. What legal right would he have had to say no if his son demanded their return? It's not his property. He's holding it. He's holding it by consent of the owner. What legal right would he have to say no?  My recommendation would be to surrender it to the sheriff if somebody was concerned about that, but I would have to investigate that issue further before I could give a firm answer. The same sheriff who said he didn't need to? Well, the sheriff said he didn't need to under different grounds based upon the residency issue. But knowing what he knew about his son's treatment for mental illness, if his son's demanding these firearms, threatening to sue, I would say the proper course of action is to fully apprise the sheriff of what's going on, including those mental health issues, and then surrender them to the sheriff so that it's out of their hands. Did he have the opportunity to surrender them to the sheriff? Unfortunately, I don't think that that appears in the record. I am not sure. Well, where did the state council made the statement? I think council made the statement. He had a choice. You could surrender them. He called the sheriff's office, he asserts. Correct. What did they say? What does the record show they said to him? The record shows that they had a discussion about whether or not the son was able to possess firearms based upon the possible residency issue, and they discussed matters like what if he's passing through the state, things like that, but they didn't discuss the mental health issues. I asked about did they say you can give them to us or give them to your son since he's moving out of state? What does the record show about that? Regarding the surrendering of the firearms, I don't. Did that discussion occur with the sheriff's office? I don't recall that happening with the sheriff's office. I recall them talking about selling the firearms potentially, but I don't recall surrendering it to the sheriff being a topic of conversation. Counsel? Yes. Your Honor, if I may, you argue that the defendant has forfeited the argument that the trial court aired when it denied the motion for the direct infinement. However, the defendant raised that issue in the post-trial motion, and the state responded, and the trial court ruled on that issue on the merits. So I guess my question is why isn't that sufficient then for this court to address that? Your Honors, the courts in Illinois have held that if you fail to raise the argument again at the close of evidence, that that causes forfeiture. I also address the issue on its merits because I recognize that, you know, your Honors might have misgivings about finding forfeiture under those circumstances, but I think that the case law is pretty clear that even if you raise this later on, failure to raise this argument again at the close of the defendant's case in chief does amount to forfeiture. So, Your Honors, I'm happy to address any other questions on the other issues that opposing counsel didn't discuss or continue my argument on those issues. Does anybody have any further questions? Well, the argument has been made in the briefs that the defendant was essentially totally unaware of him being taken to a mental facility and that he remained unaware of that. He did not know that his son was going to receive treatment if he did receive treatment. He did not know that it was a mental health facility. He does not know that his son was taken away. He knew that his son was taken away in an emergency vehicle and escorted by police. What about that argument, that somehow he never knew that his son was committed to a mental health facility? Yes, Your Honor, that pertains to the second and third arguments related to the denial of the motion for directed verdict and the finding of guilty. Your Honors, the issue with that is that there's a lot of circumstantial evidence. I think everybody would agree there's no direct evidence that the defendant said something like, I know my son was taken to this place for mental health treatment. But the circumstantial evidence in this case is quite strong. The defendant was present in the CVS parking lot while his son was talking loudly about these delusions. And there's a couple of very important points that I want to highlight here. The officers testified that the son, Travis, stated eventually that he would go to Union Point Hospital, but he was going there against his will. This is the kind of statement that I would argue creates the inference that even Travis knew that he was going to be going there for an involuntary mental health treatment. Additionally, Your Honors, this happened directly in front of the defendant. Now, I certainly understand that the defendant claims he couldn't hear these things, but viewing the evidence in light most favorable to the State, the inference is that the defendant heard all of this. The defendant was present. He was able to hear these things. And the court had ample basis to find, based upon the things that were happening directly in front of the defendant, the things that were said directly to the defendant, the defendant not only knew that his son was being taken via squad car to this hospital, which this hospital was chosen specifically because it had a behavioral health unit, but also why he was being taken there. And in addition to that, there were additional facts that came out in the defense's case in chief that supported this finding. The defendant admitted that he called EMS himself. Now, he claims he doesn't know why he called that number, that he didn't know exactly what that number was for, but it's a mental health services organization. The inference there is that he called this number because he knew what kind of help his kid needed. Additionally, he acknowledged that he went to visit his son at the behavioral health unit on a couple of occasions. He admitted that this is a unit that is locked and secured. Now, he claims he never asked anybody, including his son, about any kind of treatment that he was being given there. I would argue that that's a little preposterous. But even if you were to accept that, the fact that he had to sign in, go through locked doors, and he knew this is a behavioral health unit, and in the stipulations it states that he knew that his son was admitted there, all of that taken together creates the very strong inference that this defendant knew the kind of treatment that his son was getting there. Counsel, how do you address the issue, though, that was raised, that no treatment, in fact, was provided? I understand there's arguably an absence in the record, but while you're arguing the circumstantial evidence, what circumstantial evidence would you say supports the court's finding that treatment was provided? The circumstantial evidence that supports that the treatment was provided, well, first, the stipulation is that he was a patient under the law. So the kind of question as to whether or not he did receive the kind of treatment that would satisfy the statute I think has been disposed with. Now, counsel raises an additional point that there's essentially a lack of evidence that would contradict that stipulation. I don't think that that's a proper question for this court today. I think that that's something better raised via collateral attack because we actually don't have that information before us. It's not part of the record. It's not something that I could have reviewed. And based upon that, if there are documents that contradict it, I mean, that is the purpose of things like a post-conviction petition. But based upon what we have here, there is nothing that contradicts that stipulation, and that stipulation should be what controls, at least for today. Does that answer your question? Thank you. Your Honors, if there are no further questions, I would simply rest for the remainder of my brief. Thank you. All right, rebuttal, counsel. Can I get you started on a question? I'm sorry, Your Honor. Can I get you started on a question? Absolutely. Well, you said it has to be for or there has to be treatment given. Are you referring to the definitions in the statute under Section A? Under patient. Yeah, and it says a patient is admitted for mental health treatment. And receives. Or does it say received? It doesn't say received. I'm looking at an excerpted, so you can correct me if I'm wrong. I'm looking at it where it says admitted either voluntarily or involuntarily to a mental institution for mental health treatment. Are you under the statute? Yeah, I'm under Section A.E. Definition of patient in a mental institution. As I say, I'm ready to be corrected if there's something that I'm overlooking. Yeah, I've got to find the specific statute here. But they do explicitly explain or define both what a patient is and under patient. Patient in a mental institution means the person was admitted either voluntarily or involuntarily to a mental institution for mental health treatment. If that's the extent, I think the fact that he may have refused it wouldn't change the fact that that's why he was admitted. Yeah, to a mental health for mental health treatment. So he could refuse it. It doesn't mean that's not the reason he was admitted. But we don't know. Again, I understand what you're saying. In this case, Your Honor, the unique thing about this case is that the court, everybody wanted to focus on the fact, and to answer one of your questions about the firearms, Mr. Reinking did contact the Sheriff's Department. It's on record. There's a transcript of it. And Travis had even spoken to them, and that's what Mr. Reinking asked about. Did you guys tell Travis that he could have these firearms if he's just passing through, that he could have them? And they said yes. So you said it was okay. Yes. Right. But they were answering a specific question, and he was speaking globally, right? He was speaking about any possible impediment to him having those firearms. It was specifically about the fact that they were the ones that had Mr. Reinking take the firearms and hold them for Travis. They're the ones who contacted him once the revocation took place. I agree, and it's kind of a kick in the teeth, right? Because he took them for one reason. Correct. But the law has a provision that would prevent their being returned or given for other reasons. If he knew about that statute. Correct. So we're still back in the same place. I don't feel like that conversation with the state police or the sheriff would change that. But the affirmative defense is there that was never presented by Mr. Sullivan. He rejected that as an affirmative defense, and he also refused to bring in— That's a classic matter of strategy, right, which ones you push. And for the reasons we just discussed, it may not have had legs. Well, the bottom line, when Travis was tried down in Nashville for this crime, he presented an insanity defense. And the jury found him guilty and did not adopt an insanity defense or a mental illness defense. Everybody— How would that affect these events in any way? Well, it goes to the fact that you've got a jury with all of this evidence that they're getting about this incident that took place, but everybody's putting it back on Mr. Reinking that he's the one guy who should have known when nobody else can recognize it. The courts don't recognize it. Let's dial it back a little bit. There's no one arguing that he had to diagnose a mental health condition. It's just that he had to know that he was admitted for mental health treatment, and that's what the statute requires. For mental health treatment. Yes. And, again, if you go back to the part where there should have been a directed finding, because the two deputies added nothing to this. The two officers, their testimony did nothing to further the state's case prior to Mr. Reinking testifying. At that point, all that they knew was that one of them followed the car to Methodist, gave him a thumbs-up, and he drove away to the emergency room. They didn't know where he went. They couldn't diagnose anything. They couldn't. But what about your client? At that point, it's what did he know at that time. And all he knew was that they took him away. They even admitted that Mr. Reinking wasn't that close. They didn't tell him personally what was taking place, only that he was a car length away and should have heard. So at the close of the state's case, ASA Hawley said that their only thing they had to prove here, their burden was to show that Mr. Reinking knew that Travis was going there to receive mental health treatment. Their evidence provided nothing to that. I thought the deputies, one or more of the deputies, testified that they said, you know, your son is having these difficulties, and he needs help, he needs treatment, and that they asserted they believed the people nearby closer than a car length away, but even if a car length away, were listening and heard what they said. Well, they think that, but that's not evidence that it actually took place. They testified to it. They testified, and then on cross-exam, they also testified that they didn't know if Mr. Reinking had heard it or not. Understood, understood, but they know what they said. They know what they said, but then that Mr. Sullivan brought out the fact that none of them are experts in mental health. They don't know where Mr. Reinking, or they don't know where Travis went. They just know he went away to the emergency room. One of them knew, the other one didn't know anything because he stayed there. So the state didn't provide any evidence to get beyond a reasonable doubt to show that Mr. Reinking knew. The one burden that they said they had to prove, their evidence did nothing to further that. Okay. You're actually out of time. I appreciate it. Thank you. I'm going to let you sum up, but I do want to ask you, there's a lot to be inferred. He wasn't in an accident. He wasn't injured. There was no reason in the record suggested as to why he would be going to the hospital, other than the inference that it was a mental health issue, right? I mean, it wasn't as though there wasn't a clear context for where he was going. And your client visited him there later. Correct. That came out afterwards. But he also talked about they didn't give him any information when he was there. It's a privacy issue. He's an adult. They didn't have to give him anything. Correct. But he has no other knowledge of why else he'd be there, right? He knows he didn't break his leg. He didn't have a fever. He went to the hospital. And if we believe what the trial court believed, that he heard enough to know that he was getting mental health treatment, that's kind of all she wrote. Well, again, it comes down to what did he hear with his difficulty. And he talked about surrounding environmental issues, that if you hear a car, it's promoted more than just the surrounding, just the voice that you're going to hear. Okay. Do you have one last comment before we end? No. In summary, thank you. I would just go by what my argument was here, Judge. Thank you. All right. Thank you. Thank you, both counsel.